IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BETHLEHEM AREA SCHOOL DISTRICT, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DIANA ZHOU, | : | NO. 09-CV-03493 |

**MEMORANDUM**

Ditter, J.                                                                                                             July 25, 2012

      Defendant, Diana Zhou, filed a motion in limine to preclude the Bethlehem Area School District from calling its expert, Andrew M. Klein, and from using his revised report. I previously granted Zhou's motion in limine to prevent consideration of Mr. Klein's expert report and expert testimony at the summary judgment stage. *See* September 27, 2011 opinion and order (Dkt. Nos. 104 and 105). I found that Mr. Klein improperly provided legal conclusions and opinions regarding Zhou's intent, but held that the District could nonetheless call Mr. Klein as an expert to testify to the IDEA processes and Ms. Zhou's use thereof if the District complied with my opinion and order.

      This memorandum is filed to explain the reasons for my order of July 24, 2012, granting in part and denying in part Zhou's motion in limine. Because Mr. Klein's revised report does not meet the standards set forth for expert testimony, the District will not be permitted to admit his revised report or to call him as an expert witness, but Mr. Klein will be permitted to testify as a fact witness.

**I. Standard For Expert Testimony**

      A witness may testify as an expert only where: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the

witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. "The expert must base his testimony on properly grounded, well-reasoned and non-speculative evidence." *Engers v. AT&T*, No. 98cv3660, 2005 U.S. Dist. LEXIS 41693, *4 (D.N.J. Aug. 10, 2005) (citing Fed. R. Evid. 702 Advisory Committee Note (2000)).

To be reliable, the testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003). To determine whether testimony is reliable, the Third Circuit has provided a list of relevant factors to consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 321.

The District, as the proponent of the expert, has the burden of establishing the admissibility of Mr. Klein's testimony by a preponderance of the evidence. *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 417-18 (3d Cir. 1999); *see also,* Fed. R. Evid. 702 Advisory Committee Note (2000).

**II. Original and Revised Expert Reports**

I rejected Mr. Klein's initial report. I found that he was retained for the improper purpose of providing a legal opinion, that he provided such legal opinions, and that he offered impermissible opinions on Zhou's intent. The District has since provided a revised report dated

2

June 18, 2012 and Mr. Klein has been deposed on the content of that report.

Mr. Klein stated that in revising his report, he reviewed my September 2011 order and opinion and edited his prior report to conform to that order and opinion. He also reviewed the deposition transcript of Cynthia Leshinsky, the District's Special Education Supervisor. In addition, he performed "some research" to support the new paragraph on page ten of his revised report addressing the "industry norm" and corrected errors of math and verb tense. Klein Tr. at 289-90, 311-12.

### III. The "Industry Norm"

In rejecting Mr. Klein's original report, I specifically noted that he "fail[ed] to explain the 'industry norm'" and failed "to articulate the relevant standards or their sources." Although Mr. Klein again fails to define the "industry norm" in his report, he testified that the industry to which he is referring is the "[s]pecial education industry of issuing IEPs and NOREPs and NORAs." Klein Tr. at 292.

Mr. Klein added a single paragraph to his revised report discussing this industry norm. It reads as follows:

> Using Pennsylvania as an example, for the 2010-2011 School Year, 740 hearings were requested (excluding Section 504 requests but including gifted). It is safe to assume all of these matters began with a disapproved NOREP. With a total of 270,000 children holding IEP's in the Commonwealth, this translates to 0.27% of parents requesting hearings during the last school year. Conversely, 99.73% of families reached agreement with their school districts via an approved NOREP. If one adds in the additional 70,000 Mentally Gifted children with GIEP's [sic] in the Commonwealth, the disapproval rate drops to 0.22% or a 99.78% approval rate. Recognizing the reality that parents disapprove NOREP's [sic] and NORA's [sic] and then go on to resolve their disagreements with the school district would not, by any stretch of the imagination, lower the acceptance below the ninetieth percentile.

3

Klein Revised Report at 10.

Mr. Klein testified that he calculated the industry norm by dividing the total number of special education and gifted hearings requested in Pennsylvania in the 2010-2011 academic year– 740 – by the number of children with IEPs or who were eligible for gifted services that year – 340,000. He therefore found the industry norm "approval rate" to be 99.78 percent.

Just as in his original report, Mr. Klein found that Zhou had filed requests for fourteen due process hearing, four mediations, and two OCR complaints. He stated that Zhou had approved only six NOREPs or NORAs[1] of the thirty proffered by the District, and only four were approved "without annotations." He calculated Zhou's approval rate by dividing the number of NOREPs or NORAs that were offered to her by the District for both children, including her non-IDEA eligible child – 30 – by the number of NOREPs or NORAs that he found Zhou had approved– 4 – or approved "without annotation" – total of 6. He opined that Zhou's 13 percent (4 approvals out of 30) or at best 20 percent (6 approvals out of 30) approval rate was far below the "'industry norm' of approvals in the ninety percentiles." Klein Revised Report at 10.

**A. "Industry Norm" Is Not Supported By Sufficient Data or a Reliable Method**

Zhou challenges the reliability of Mr. Klein's opinions. I find that Mr. Klein's testimony in support of the industry norm and his revised report fall far short of meeting the requirements for expert testimony. There are substantial and obvious problems with both the information proffered and the methodology utilized by Mr. Klein.

---

[1] NOREP stands for Notice of Recommended Educational Placement and NORA stands for Notice of Recommended Assignment.

### 1. Facts and Data Are Not Sufficient

Mr. Klein testified that he doesn't know "that there is any way of determining an industry norm." Klein Tr. at 325. He stated that he could not cite to any studies regarding the industry norm of IDEA proceedings and that he had not seen any data to support approval rates in the ninetieth percentile. *Id.* at 325-27.

In addition, Mr. Klein failed to explain why Pennsylvania and the 2010-2011 academic year are appropriate models of the industry as a whole. He testified that he "could not find any hearing data nationally for 2010-11." Klein Tr. at 316. He also neglects to identify the source of his data in his report, although he stated that he consulted the Office of Dispute Resolution annual report for 2010-2011 and the Pennsylvania Department of Education and Bureau of Special Education websites. *Id.* at 318-19. Although the report states that the 740 hearings include "gifted," he testified that he thought there was one gifted hearing so the total number should be 741. *Id.* at 322.

Furthermore, Mr. Klein stated that the 270,000 children is a rounded off number, but did not provide the actual number of children or explain why he did not use the actual number in calculating the approval percentage. *Id.* at 313-14. Although Mr. Klein attributes all of the 740 hearing requests to parents, he testified that he did not know whether these hearings were requested by parents or school districts. He didn't know if the requests were made by separate sets of parents or represented multiple requests by the same parents, despite recognizing that such data was available. *Id.* at 339. He also did not inquire about data relating to hearing requests made by the same parents in prior years, as is the case here. *Id.* at 340.

Mr. Klein's report resorts to stretching one's imagination because, as he concedes, he has

no data to support his belief that the industry norm is a 90 plus percentage approval rating over time. *Id.* at 345-46. He testified that in some cases where a parent requests a hearing because he or she disapproves of the NOREP or NORA, the case is resolved before the hearing is conducted. However, he never explained how resolution prior to a hearing influences the approval rate that he defines as the industry standard. Indeed, he testified that "we don't have numbers" reflecting these resolutions, and he couldn't match his estimates – which he based on his seventeen-year experience as a hearing officer from 1986 to 2003 and only on those hearings over which he presided (approximately 5% of the cases in Pennsylvania) – with the available federal data. *Id.* at 315-16.

## 2. Methodology and Application of the Industry Norm Is Not Reliable

There are additional problems with Mr. Klein's methodology and application of the "industry norm." He conceded that he has no expertise in statistics and has never used the methodology he described to determine the industry norm for IDEA proceedings anywhere else other than in this report. *Id.* at 327-28.

In addition, he acknowledged faults in applying his methodology. He testified that the information he used to calculate Zhou's at-best twenty percent approval rate was not comparable to the information he used to arrive at the industry norm, but he had "to have something to go with." He stated that he looked at Zhou over the course of ten years, including her two children and both gifted and IDEA hearings but that he had no information in his report looking at the behavior of parents across time and accounting for number of children and both IDEA and gifted hearings. *Id.* at 341.

In addition, he recognized that if parents disagreed with a single NORA or NOREP, they

6

would be outside the industry norm for the year in which they disagreed. He testified that Zhou was within the industry norm in any particular year where she did not request a hearing (Kelin Tr. at 350-51), and that the District, in requesting at least four, and possibly five, hearings was outside the norm. *Id.* at 419.

## IV. Impermissible Opinion on Zhou's Intent

Mr. Klein's initial report was rejected because he set forth opinions on Zhou's intent. Although Mr. Klein did strike some references to Zhou's intent, he left others, including those I said I would not allow. For example, the revised report offers an opinion on Zhou's "ultimate motivation and demand" which Mr. Klein defines as "a demand that the school district place both of her children at the Moravian Academy, a non-public school within Northampton County." He conceded this was an opinion as to Zhou's motivation despite repeatedly acknowledging that I had made it clear that he was not to provide such an opinion.

In addition, defying credibility and logic, if not my previous order, he testified that his initial opinion regarding Zhou's intent was based on the now excluded deposition testimony of mediator William Haussmann, but the very same opinion using identical language in the revised report is no longer based on Mr. Haussmann's deposition. Tr. 393-94.

Mr. Klein's revised report thus continues to proffer impermissible opinions regarding Zhou's intent and will not be admitted.

## V. Conclusion

I recognize that "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Note (2000). Nonetheless, an expert must base his testimony on sufficient facts and data and utilize a reliable methodology. Mr. Klein's revised

7

expert report and his testimony supporting that report do not meet these requirements. Zhou's motion in limine to preclude the District from admitting Mr. Klein's revised expert report and from calling Mr. Klein to testify as an expert at trial is therefore granted.

However, Mr. Klein may be called as a fact witness and may testify to his knowledge of the IDEA processes based on his experience as a hearing officer and special education administrator. He may not, however, offer an opinion pursuant to Federal Rule of Evidence 702 or provide any testimony regarding the "industry norm" or "approval ratings."

This memorandum is filed to explain the reasons for my order of July 24, 2012, granting in part and denying in part Zhou's motion in limine to preclude the District's expert.

BY THE COURT:

/s/ J. William Ditter, Jr.
J. WILLIAM DITTER, JR., J