**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **BETHLEHEM AREA SCHOOL DISTRICT** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **DIANA ZHOU** | : | **NO. 09-CV-03493** |


## MEMORANDUM AND ORDER

**Ditter, J.**                                                              **April 9, 2013**

In bringing this case, a school district relies upon a provision of the Individuals

with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1415(i)(3)(B)(i)(III), that

permits recovery of costs from a parent who has presented a claim or subsequent cause of

action for any improper purpose.[1]

In support of my conclusion that the district is entitled to its costs, I hereby make

the following:


## FINDINGS OF FACT

1.  The Bethlehem Area School District is a regularly constituted school district of

Pennsylvania.  It provides educational services to children from the city of Bethlehem,

two boroughs, and two townships and does so with sixteen elementary schools, four

---

[1] After the district brought the present action, the parent contended in a counterclaim that the district had
retaliated against her by taking or failing to take six specific actions.  A jury heard that aspect of the case and
awarded the parent damages.  There is no conflict between its verdict and my findings and conclusions.

middle schools, and two high schools. During the times that are important in this litigation, it had approximately 15,000 students of whom approximately 2,200 were children who had disabilities, ranging from those with minimal special needs to those who had total care requirements.

2. School districts in Pennsylvania are governed by a series of laws, two of which are important here: the IDEA, §§ 20 U.S.C. 1400 *et seq.*, a federal law, and the Special Education for Gifted Students ("SEGS"), 22 Pa. Code § 216.1 *et seq.*, a state law.

3. The IDEA requires that the school district provide to each child with disabilities a free, appropriate, public education, one that is specially designed to meet the child's needs together with such related services that are required to do so. The education and services shall be under public supervision and direction and are to be without cost to the child and his or her parents.

4. The IDEA does not require the school district to provide the best possible education but one that is more than minimal. The IDEA does not require a school to provide all that a parent wants or whatever may be required for a child to reach his or her fullest potential. The IDEA does not require a guarantee that a child will even be equipped to get a job, raise a family, and become a contributing member of society.

5. The IDEA requires that school districts develop and put into place an Individual Education Plan ("IEP") for each child with disabilities so that there will be benefits that can be measured. An IEP is appropriate if the data shows that the child is making

progress based upon that plan.  Parents play a significant role in this process.  They serve as members of a team that develops the IEP and their concerns for enhancing the education of their child must be considered by the IEP team.  Nonetheless, the IDEA places the primary responsibility for developing and executing an educational program on the state acting through it agencies.  In addition, the IDEA relies heavily upon the expertise of school districts to meet its goals.  *Schaffer v. Weast, Superintendent, Montgomery County Schools, et al.,* 546 U.S. 49 (2005).

6.  Other members of the IEP team include at least one regular teacher, at least one special education teacher, a representative of the district, and if appropriate, the child.  The IEP is created by the team – the particular views of each member will be considered but his or her ideas will not be determinative.

7.  The goal is always to provide for a child's needs in the regular education setting, referred to as the least restrictive environment, rather than taking him or her from the regular classroom to some other classroom.

8.  The SEGS program requires specially designed instruction based on the student's need and ability and as well as opportunities to participate in acceleration or enrichment, or both.  As with the IDEA's requirement for the preparation of an IEP, SEGS requires the preparation of a Gifted Individual Education Plan ("GIEP") so that a gifted child's needs will be identified and progress toward stated goals can be measured.

9.  Upon the completion of an IEP, the district prepares a Notice of Recommended

Educational Placement ("NOREP") for each IEP. On receipt of a student's NOREP, the parent indicates whether he or she approves or disapproves the recommended program. If the parent disagrees, he or she has the option of requesting a pre-hearing conference, a mediation, or a due process hearing. If the parent does not indicate a request for one of these three options, a school district may choose to implement the proposed IEP.

10. A parent who is not satisfied with the NOREP challenges it by filing a complaint. The district then convenes a pre-hearing conference. The parent meets with the relevant members of the IEP team who have specific knowledge of the facts identified in the complaint. At this meeting, the parent and the district representative discuss the complaint, the facts that form its basis, and whether the team can resolve any outstanding issues.

11. Mediation is a voluntary process. The parties meet with a neutral state officer who will attempt to bring them to an agreement. Mediation is more formal than a pre-hearing conference, but less formal and in most instances an easier forum for resolving disputes than the final step, a due process hearing

12. At a due process hearing, a state officer hears testimony, considers documents, briefs, and argument, makes findings, and ultimately decides whether the IEP is appropriate or not. The district is represented by counsel and the parent may be, but is not required to be represented by counsel.

13. The filing of a complaint by a parent requires extensive preparation by the

district.  Meetings with counsel require participation by supervisors, principals, counselors, and teachers, all of whom must set aside their regular duties. Teachers cannot meet with their classes and thus substitute teachers must be provided.  Counsel must be paid – and depending how long hearings may last – the district may incur expenses from $10,000, $60,000 to $70,000, or even higher.  *See N.T.,* Aug. 6, 2012, at 48 (Agretto testimony).

14.  If a school district prevails when a parent has requested a due process hearing and believes that the parent filed or pursued the complaint for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation, the IDEA permits the district to seek its costs, including attorneys fees, against the parent. 20 U.S.C. § 1415(i)(3)(B)(i)(III).

15.  It is that provision of the IDEA which forms the basis of this suit. [2]

16.  Diana Zhou is the mother of two sons, M.Z., who was born on November 24, 1995, and J.Z., who was born on February 23, 1999, both of whom were district students. Mrs. Zhou was born in China and Mandarin Chinese is her native language.  She studied

---

[2] In this case, M.Z. had an IEP and a GIEP.  His brother, J.Z. had a GIEP.  A GIEP is a statement of the student's present level of educational performance, annual goals and short-term outcomes, specially designed instruction and support services to be furnished, relevant dates, and objective criteria and assessments for determining whether the goals and outcomes are being achieved.  It is prepared by a team much like an IEP team. GIEP team meetings are convened at least annually and at the request of a GIEP team member, the parent, the student, or the school district.

If a parent disagrees with a school district's GIEP, the parent may request mediation or an impartial due process hearing.  A school district may request a due process hearing to proceed with an initial evaluation or a reevaluation, or when a parent rejects the district's proposed educational placement.

Although the boys received services under both the IDEA and SEGS, it is M.Z.'s IEP services under the IDEA that are relevant to the issue at bar.

electrical engineering in China, came to the United States in the 1980s, and was graduated from the University of Arizona in 1989 with a degree in electrical engineering.  She was employed as an electrical engineer for 10 years but is no longer employed.

17.  Mrs. Zhou's parents lived with her and the two boys.  Mandarin Chinese is the only language spoken in the home.

18.  Although not perfect, Mrs. Zhou's English was understandable and the district's teachers, counselors, and administrators had no difficulty in communicating with her.

19.  Mrs. Zhou appeared before me at a hearing and as a trial witness.  Although she sometimes spoke too rapidly for me to follow what she was saying, I had little difficulty in understanding her when she spoke slowly.  She did not appear to have any significant difficulty understanding the testimony of other witnesses, or questions posed to her when she testified.  On occasion she asked for the translation of a word.

20.  Both M.Z. and J.Z. are gifted students and both received gifted services from the district.  In addition, M.Z. was diagnosed as having Central Auditory Processing Disorder ("CAPD") and Pervasive Developmental Disorder Not Otherwise Specified ("PDD-NOS").  The former is not a problem of hearing but interpreting what is heard, especially if the environment is less than ideal.  The latter is considered a form of autism, usually a milder form, and lacking in some of autism's characteristics.

21.  Mrs. Zhou is ambitious for her two sons and their success in life – not merely

to achieve, but to excel.  Early on she recognized that both were gifted.  Blessed with tremendous energy and ability, she read, studied, planned, suggested, and made demands upon the district.  Mrs. Zhou is highly intelligent, well-informed, and uncompromising. To further her knowledge, Mrs. Zhou met with other parents whose children also suffered from autism.  She suggested programs and methods to take the place of those the district was using.  She devised reports she wanted the boys' teachers to complete.  She submitted check lists and charts to better record progress.  If there were district programs and services that Mrs. Zhou accepted, there were always additions, stipulations, and something more that she wanted.

22.  It is necessary for a parent to meet with his or her child's teachers and counselors.  A parent is encouraged to take part in the preparation of IEPs.  However, the sheer volume of a parent's suggestions, requests, and demands, their nature, and a parent's insistence that they be adopted, especially if the IDEA's purposes and limitations are ignored, may be unreasonable, lacking in good faith, and even may be evidence of an improper purpose.

23.  From before M.Z. entered kindergarten in September of 2001, Mrs. Zhou was aware that she could formally challenge decisions made by the district concerning the education of her sons.  In June of 2001, she requested a pre-hearing conference so she could discuss her concerns about an IEP that had been prepared for M.Z. and his needs if he was to be successful in school.  *Trial Exhs.,* Z-3, Z-4.

24.  In May of 2003, Mrs. Zhou requested a due process hearing despite the fact that there had been several pre-hearing conferences and a mediation.  Mrs. Zhou disagreed with the IEP that had been prepared for M.Z. and wanted each of his teachers to complete a weekly skills-in-training chart she had provided.

25.  When M.Z. entered kindergarten in 2001 and thereafter, Claire Hogan was the elementary school supervisor of special education overseeing the needs of approximately 500 children.  Over the years while M.Z. was in elementary school, Ms. Hogan had numerous meetings and conversations with Mrs. Zhou, formal and informal, as well as in connection with the preparation of IEPs and for mediations and hearings.

26.  Ms. Hogan testified that Mrs. Zhou continually rejected the district's recommendations for the district's services to M.Z. despite his progress, and although she understood Ms. Hogan's explanations, Mrs. Zhou insisted that things be done her way. She tried to dictate curriculum, wanted weekly reports from each of her son's teachers, and presented books, charts, and strategies that she had found.  If Mrs. Zhou did not get exactly what she wanted, she would access her rights and go for a pre-hearing conference, a mediation, or a due process hearing despite the similarity of issues and the fact that the district's position was previously affirmed at the due-process level.  She requested hearings when other hearings were still pending.  Ms. Hogan spent "many, many hours" meeting with Mrs. Zhou and there were hearings that lasted until midnight.  Ms. Hogan rearranged her schedule so she could try to obtain Mrs. Zhou's agreements.

27. Ms. Hogan testified further that in her 28 years in education, 18 as an administrator for special education services, no parent had asked for as many pre-hearings conferences, mediations, and due process hearings as had Mrs. Zhou. Ms. Hogan considered Mrs. Zhou's filings to be improper.

28. I accept Ms. Hogan's statements, conclusions, and opinions as being accurate and include them as part of these findings of fact.

29. In 2005, Michele M. Fragnito was the principal at the elementary school that M.Z. and J.Z. attended. In that capacity, she had many contacts with Mrs. Zhou and was thoroughly familiar with Mrs. Zhou's suggestions, requests, demands, and the programs provided for M.Z. and J.Z. Some of Mrs. Zhou's demands were unreasonable. Mrs. Zhou's refusal to accept plans presented to her made necessary a constant revision of GIEPs and IEPs. Ms. Fragnito testified that no matter what was provided, Mrs. Zhou wanted more. Mrs. Zhou telephoned teachers directly while they were busy in the classroom and violated the school's sign-in procedures.

30. Ms. Fragnito testified that in her 35 years in education, 20 of them as an elementary school principal, she had never known a parent to exercise her due process rights as Mrs. Zhou did. Mrs. Zhou initiated between four and six due process hearings, even filing for a new one while another hearing was pending. In each instance, the district prevailed with the hearing officer determining that the services being provided were in keeping with that which was required.

31.  I accept Ms. Fragnito's statements, conclusions, and opinions as being accurate and include them as part of these findings of fact.

32.  Richard Agretto, the district's director of special education, testified that Mrs. Zhou always wanted more for M.Z. than other students were receiving – their class size reduced, more acceleration, occupational therapy services, always more for M.Z. despite the fact that he was making appropriate progress with the services that were already in place.  Over time, hundreds and hundreds of hours of conversations and discussions took place between Mrs. Zhou and the school's staff.  Mrs. Zhou used due process hearings to challenge the services that were planned and provided, but each time she did so, the district's position was affirmed.  Nonetheless, whenever a due process hearing was requested teachers were pulled from their classrooms, administrators taken from their buildings, substitute teachers provided and paid.  The expenses all added up.

33.  Mr. Agretto stated the district felt Mrs. Zhou was holding over its head the threat of due process knowing the hearings' impact on the staff, and that these hearings left the IEP team members frustrated, particularly the class-room teachers.

34.  I accept Mr. Agretto's statements, conclusions, and opinions as being accurate and include them as part of these findings of fact.

35.  After Mrs. Zhou's first interaction with the district in 2001 when she requested an evaluation of M.Z. as he was passing from early intervention, pre-school services, to kindergarten, M.Z. continued to receive special services to help him with his learning

disabilities.

36.  In addition, both M.Z. and J.Z. continued to receive special services and advanced courses because they were gifted.  Both were honor students, receiving excellent grades.  Nonetheless, Mrs. Zhou had a series of concerns about their education.

37.  In his early days, M.Z. was disruptive in the classroom, would belittle other children, and sometimes strike them.  However, as a result of the services provided by the district, his socialization improved dramatically:  he was no longer isolated, he was on the track and field team, on the debate team, was in a school play, and one year was voted to be vice president of his home room.  He excelled academically and as a freshman in high school was seventh out of 600 students at the school.  These facts show that the district's services and programs were providing M.Z. with a free, appropriate, public education, despite Mrs. Zhou's protestations to the contrary.

38.  In furtherance of her efforts on behalf of M.Z. and J.Z., Mrs. Zhou made unscheduled visits to their school, ignored visitation rules, telephoned classrooms, attended classes, conferred with teachers and administrators, and generally made known her suggestions, requests, and demands for what she considered to be the needs of her sons.

39.  In addition, Mrs. Zhou was an active participant in the preparation, changes, and revisions of M.Z.'s IEPS and GEIPS.

40.  M.Z. was one – but only one – of approximately 2,200 students in the  district

with special needs.

41.  On January 9, 2003, when M.Z. was seven and in first grade, the process of developing an IEP began.  The IEP went through numerous revisions to incorporate Mrs. Zhou's suggestions and requests.  The final IEP, dated January 30, 2003, included many of Mrs. Zhou's suggestions and had input from M.Z.'s  teachers, a behavior specialist, and a speech therapist.  When Mrs. Zhou did not return the NOREP within ten days, the district implemented the IEP.

42.  Mrs. Zhou disapproved the NOREP on March 7, 2003, and efforts to reach an agreement on a revised IEP continued for almost six months.  Despite a mediation and a pre-hearing conference, no agreement was reached.

43.  Under a concept called *pendency,* if a parent and an IEP team cannot agree on a new IEP, a previous IEP, perhaps two years old, must still be implemented.  As a result, the child does not receive the level of services based upon the child's progress and current needs.  Mrs. Zhou's repeated filings for mediations or due process hearings not only required many hours of teachers' and administrators' time but delayed appropriate services for Mrs. Zhou's children.  *See N. T.,* Aug. 8, 2012, at 12, 23-24, 27, 36, and 49 (Hogan testimony).

44.  At the request of the district, there was a due process hearing to resolve the IEP impasse.  In a decision dated November 6, 2003, the hearing officer reviewed in detail the numerous efforts made to produce an IEP that would be acceptable to Mrs. Zhou, and

having done so, concluded that despite her objections, the IEP of January 30, 2003, had been appropriately developed, was appropriate for M.Z.'s needs, and had been properly put in place.

45. In the spring of 2007, Mrs. Zhou and district representatives had many meetings looking toward the preparation of a new IEP for M.Z. As a result of Mrs. Zhou's concerns, a series of tests and assessments were administered to evaluate M.Z.'s comprehension of oral instruction, his ability to stay on task and complete assignments, to assess his skills in handling emotional and relationship issues, his current level of generalization of speech, language therapy goals, his planning and organization skills, and the impact of noise in his classroom.

46. To address Mrs. Zhou's concerns and requests, M.Z.'s records and present data were reviewed. An updated Wechsler Individual Achievement Test - 2nd Edition ("WIAT-II") was performed and this standardized test placed M.Z. in the high average to superior range. To evaluate his behavior, and area of concern, the Behavior Assessment System for Children, Second Edition ("BASC-2") was implemented. The Behavior Rating Inventory of Executive Function ("BRIEF") was chosen to assess M.Z.'s executive functioning skills. The Behavioral Observation of Students in Schools ("BOSS") was utilized to measure M.Z.'s engagement in academic tasks. Each of these tests provided for input by Mrs. Zhou and separate input by M.Z.'s teachers.

47. An audiological report indicated that M.Z.'s hearing was within normal limits

and a Functional Listening Evaluation yielded a score that would not effect education. On the Fisher's Auditory Checklist, M.Z.'s score was above average for age and grade. In the area of Speech Language Pathology, on the Language Processing Test-Revised ("LPT-R"), as well as on the Test of Pragmatic Language ("TOPL"), M.Z.'s scores were within the average range.

48. In the Test of Problem Solving 3: Elementary ("TOPS3: Elementary") areas of concern were tested and some problem areas were noted including making inferences, problem solving, and determining causes. On the Beery Buketnica Developmental Test of Visual Motor Integration - VMI, an occupational therapy test, M.Z. scored within the average range except for the motor coordination component which placed him slightly below average when speed was increased.

49. The results, scores, and evaluations from these tests were used to prepare a Reevaluation Report dated March 5, 2007, that concluded M.Z. had needs in the area of social skills, organizational and planning skills, task behavior and decreased hyperactivity, self-monitoring skills, coping skills, self-esteem, increasing vocal volume, pragmatic skills, inferences, problem solving and cause and effect. Appropriate counseling and therapy were recommended. However, M.Z.'s behaviors had not impeded his educational performance as he consistently achieved high grades in elementary school. It was also noted that there were no educationally relevant discrepancies between M.Z.'s ability and achievement.

50.  M.Z.'s successful scores on these various performance evaluations and his obvious educational achievements did not satisfy Ms. Zhou or assuage her concerns. Following the Reevaluation Report there were meetings with Mrs. Zhou and the district's representatives to prepare an IEP for M.Z. that would satisfy Mrs. Zhou.  A new IEP was prepared dated March 28, 2007.  The district prepared a NOREP, dated April 4, 2007, and presented it to Mrs. Zhou.  She disapproved it.

51.  An updated Audiological Reevaluation Report was performed on April 9, 2007.  It indicated that M.Z.'s auditory skills would be only slightly compromised, if at all, by his classroom learning environment.

52.  The IEP team met again on April 17, 2007.  Claire M. Hogan, supervisor of special education, attempted to address the reasons for Mrs. Zhou's disapproval of the NOREP dated April 4, 2007, that disapproved the proposed IEP dated March 28, 2007. However, Ms. Hogan was prevented from doing so because Mrs. Zhou insisted to presenting five pages of notes and requests.  Those requests were considered and the district made recommendations and suggestions.  Mrs. Zhou refused to accept any of them.

53.  The team prepared a revised IEP, dated April 17, 2007, that adopted some of Mrs. Zhou's Behavior Checklist requests, new annual IEP goals, other IEP goals that included a consideration of whether there was a need for smaller and quieter classrooms, teacher in-service training, school-bus cameras, and lunch-table concerns.  *Trial Exh.,* Z-101.

54. By e-mail dated April 18, 2007, Mrs. Zhou explained why she was still not satisfied with the District's IEPS and NOREPs and set forth her hopes for M.Z.'s future:

> I want Michael to get through (sic) training from professionals in the area he is weak:
>
> 1. planning and organization skills (on page 1, p2 of the 4/18 paper I presented to the IEP team)
> 2. social skills[3]
> 3. self-awareness and regulate self-emotion training...
>
> My mission is always to help Michael, never to fight school. To me Michael is a seed, not a stone. This seed can grow become a huge tree if gardener take good care of it. Members of IEP team are Michael's gardeners. Many great people are from children with some problem. Einstein is one of them. Einstein mother os (sic) my role model. I do not want to give up "my hope to produce the world's 2nd Einstein to be."

*Trial Exh.*, Z-99. At that time, M.Z. was 11 years old.

55. The law requires that a school district provide a free appropriate public education. The law does not require a district to maximize a child's potential or cause him or her to become a second Einstein.

56. Mrs. Zhou did not contend then – or after – that the IEP team that produced the IEP dated April 17, 2007,, (or the revised IEP dated May 31, 2007) was not properly constituted or that its meetings were not properly held. Mrs. Zhou did not contend that the

---

[3] In her in-court testimony she explained that she had listed a need for professional training **for M.Z.** in the area of social skills because other children were mean to him in the cafeteria, they intentionally excluded him from sitting at their tables, and kicked his chair in class. Sometimes M.Z. would just sit by himself in the cafeteria. I confess I do not understand why Mrs. Zhou thought that exposing M.Z. to thorough professional training would make other children polite and considerate. Moreover, in her three-page letter of explanation dated April 27, 2007, Ms. Hogan said there had been several cafeteria observations by staff members, and in each instance, M.Z. was sitting appropriately and interacting with his peers.

IEP dated April 17, 2007 (or the May 31, 2007 IEP), failed to provide M.Z. with an appropriate public education without cost to him or to her, that the IEP team had failed to arrange for testing, had failed to consider the results of the testing, had failed to consider the Reevaluation Report dated March 6, 2007 and its recommendations, had failed to consider the Audiological Evaluation dated April 9, 2007 and its findings, or had failed to consider her list of suggestions, requests, and concerns including those made at the April 17, 2007, IEP meeting. Mrs. Zhou did not contend that further testing was necessary or desirable. Mrs. Zhou did not contend that, despite the services provided by the district to M.Z. in the past, he had not made measurable progress in overcoming his various disabilities.

57. There were further meetings but to no avail and, by letter dated April 27, 2007, Mrs. Zhou requested both mediation and a due process hearing to deal with all of the issues she had raised at the IEP for M.Z. meeting on April 17, 2007. Unresolved were issues she "cared very much [about]." In this letter Mrs. Zhou says in part,

> I hope we can solve all issues ASAP before end of year. If we reach agreement, I will withdraw due process hearing. For now I have to request due process hearing in case we are not able to solve issues and I am running out of time to have hearing at the end of school year . . . I hope to resolve all issues within (sic) IEP team. Due process hearing and mediation is the last thing I want to do.

*Trial Exh.*, Z-100.

58. As Mrs. Zhou said, her only reason for requesting a due process hearing was the IEP team's failure to resolve to her satisfaction the issues she had raised at the team's

meeting on April 17, 2007.  If those issues were resolved to her satisfaction, she would

withdraw her request for a due process hearing.

59.  The IEP team had considered suggestions and requests that Mrs. Zhou had

made at the meeting on April 17, 2007, and had included some of them in a modified IEP

proposed that same date.  After another meeting on May 31, 2007, the final version of

M.Z.'s new IEP was adopted.  Nonetheless, Mrs. Zhou did not withdraw her request for a

due process hearing.

60.  Over the years, that is from 2001 up to and including 2007, Mrs. Zhou and the

district were involved in a series of pre-hearing conferences, mediations, and due process

hearings.[4]

61.  As a result of her participation in these proceedings, Mrs. Zhou was aware that

they required preparation by the district that included teachers, counselors, principals, and

supervisors all of whom were thereby taken from their regular duties.

62.  As a result of her participation in these proceedings, Mrs. Zhou was aware that

the district would employ counsel to represent it.

63.  As a result of her participation in these proceedings, Mrs. Zhou was aware that

---

[4] The exact number is not certain – there were different recollections and perhaps time-frames.  According
to a "Demonstrative Exhibit" referred to by Mrs. Zhou's counsel, there were eight due process hearings.  Mr. Agretto
testified that there were 14 due process hearings and 10 other mediations.  Ms. Hogan testified that at the elementary
level there were 10 due process hearings and 10 to 14 additional mediations.  Ms. Fragnito said that Mrs. Zhou had
initiated four to six due process hearings, even filing for a new one while another was pending.  Ms. Leshinsky said
she participated in three due process hearings while M.Z. and J.Z. were in middle school.  Of course, the precise
number of pre-hearings, mediations, and due process hearings is unimportant – the point is that Mrs. Zhou knew of
their nature, that district-preparation was required, and that in some instances, counsel would be present.

no matter what the decision, the district would incur expenses.

64.  Mrs. Zhou's failure to withdraw her request for a due process hearing presented an ultimatum to the district: either resolve to her satisfaction the issues she had provided to the IEP team or incur the required financial obligations as well as making the necessary preparations, i.e., take teachers from their classrooms and provide substitutes; keep required counselors from providing help to other special needs students; require principals, assistant principals and other administrative personnel, including the director of special education and his office staff, be available to participate in the hearings.

65.  After two lengthy telephone conferences, the 2007 due process hearing was held in three sessions – June 7, 25, and 26.  It was agreed that the issue for the hearing officer was limited to whether or not the IEP dated May 31, 2007, was appropriate to provide meaningful educational benefit to M.Z., particularly in the areas of prediction, inferencing, drawing conclusions, listening comprehension, planning, organization, time management, classifying concepts, classroom noise, and eye contact.

66.  The hearing officer noted that several district professionals who had served M.Z. since the beginning of his academic career did not agree with Mrs. Zhou's opinions. Nonetheless, the district had carried out the Reevaluation Report and the updated Audiological Report.

67.  Despite the fact that Mrs. Zhou had agreed that the only issue before the hearing officer would be the adequacy of the May 31, 2007 IEP, during the hearings Mrs.

Zhou brought up other issues, for example, a checklist she had developed and a proposed methodology for the classroom.

68. The hearing officer considered each of the May 31, 2007 IEP identified areas of concern but she did not consider the additional areas of concern raised by Mrs. Zhou or her checklist and proposed classroom methodology.

69. On August 1, 2007, based on the evidence and the testimony, the hearing officer concluded that M.Z.'s needs were addressed in the May 31, 2007 IEP and ordered the district to implement it. Thus, the district was the prevailing party in this procceding.

70. The due process hearing was required, convened, and held at Mrs. Zhou's request. It was required, convened, and held because the members of the team who created the May 31, 2007 IEP for M.Z. did not agree to accept Mrs. Zhou's position on every issue she had submitted to it.

71. On October 26, 2007, Mrs. Zhou requested a meeting so that a new IEP for M.Z. could be prepared. In response the district sent her a NOREP, dated October 30, 2007, advising that it was implementing the May 31, 2007, IEP in accordance with the hearing officer's decision, and therefore, would not meet with her for the preparation of a new IEP. *Trial Exh.*, P-41.

72. In an accompanying letter dated October 30, 2007, Mr. Agretto also explained that the district was implementing the May 31, 2007 IEP as the hearing officer had ordered on August 1, 2007, and that all the issues Mrs. Zhou wanted to discuss had been

considered and passed upon in that due process hearing. For that reason, the district refused to meet with her at that time.

73. On November 13, 2007, Mrs. Zhou disapproved the NOREP. She did not contend that the district was not complying with the hearing officer's order to implement the May 31, 2007 IEP. Mrs. Zhou did not contend that the issues she wanted considered at another IEP meeting were different than those the hearing officer had considered in reaching her August 1, 2007 conclusion that the May 31, 2007 IEP met M.Z.'s needs. As the reason for her disapproval, Mrs. Zhou said:

> See all my emails & notes to school from the beginning of this school year. Many issues are raised in these emails and notes. They are not solved. School is not willing to look at every issues (sic) I raised in many letters mails. I did not get many written responses either.

*Trial Exh.,* P-41.

74. Mrs. Zhou presented no evidence that the various IEPs prepared for M.Z. over the years, including the ones she rejected, failed to provide for him a free, appropriate, public education.

75. Mrs. Zhou's October 26, 2007 request for a meeting so that a new IEP could be prepared for M.Z. was made despite her knowledge that the hearing officer had, on August 1, 2007, ordered the district to implement the IEP of May 31, 2007.

76. Mrs. Zhou was aware that a meeting to prepare a new IEP would require the participation of teachers, counselors, principals, administrators, and thereby take them from their regular duties. Mrs. Zhou was also aware that counsel might be required. Mrs.

Zhou was aware that the preparation of a new IEP would require the district to spend money.

77. Mrs. Zhou's request for a meeting to prepare a new IEP was made for an improper purpose, that is, to address issues that had already been discussed and decided upon in the due process hearing.

78. Apparently, not satisfied with the district's refusal to accede to her demands and the obvious progress of both M.Z. and J.Z., in late 2007 or early 2008, Mrs. Zhou expressed her desire that both sons should go to Moravian Academy, a college preparatory school, and that the district should pay $23,000 for each boy, each year, for their tuition. Although it was explained to her that Moravian did not provide the special education services that M.Z. needed, and that the district could not pay for their tuition at a private school, Mrs. Zhou embarked on a deliberate campaign to drive up the district's costs in order to convince the district it would be cheaper for the district to meet her tuition demands than to refuse to do so.

79. It was Mrs. Zhou's plan to have M.Z. and J.Z. attend Moravian and if not Moravian, attend one of east's premiere college preparatory schools even though such a school would not be able to provide for M.Z.'s learning disability.

80. Claire Hogan testified that starting in 2008, Mrs. Zhou's rate of disapproving or rejecting IEPs and GIEPs noticeably went up. Her behavior in this regard over the next year or so confirmed for the district that Mrs. Zhou's intention was not to help devise a

free, appropriate, public educational program for her sons but to make the process so costly to the district that it would agree to provide a free private school education for her sons.

81.  Also beginning in 2008, Mrs. Zhou demanded that the district provide an interpreter to translate proceedings from English into Mandarin Chinese.  It did so.  On May 8, 2008, Mrs. Zhou asked for a due process hearing to consider the adequacy of the district's gifted education program for M.Z.  At her request, a translator was provided during each of the three days that hearings were held.  Mrs. Zhou appealed the hearing officer's decision and asked that the district have 600 pages of transcripts translated into Mandarin at a cost of $50,000[5] because of her difficulty understanding some expressions in English.[6]  *Trial Exh.,* P-5.  Although both the hearing officer and the Appeals Panel ordered the district to provide the translated transcripts, the order was reversed by the Commonwealth Court.

82.  Cynthia Leshinsky, the district's middle school supervisor of special education, met with Mrs. Zhou on or around May, 31, 2007, when M.Z. was completing fifth grade and preparing to advance to sixth grade in September, 2007.  In connection with M.Z.'s transition to middle school, IEPs and GIEPs were prepared.  Over the course of the next 14

_____

[5] Mrs. Zhou testified she did not know the cost would be that much.  Whether she thought the cost would be $50, $500, $5,000, or did not think about the exact cost one way or other is unimportant.  Her purpose was to drive up the district's expenses so it would agree to pay the tuition costs for M.Z. and J.Z. to attend Moravian.

[6] Mrs. Zhou took the opposite tack  in May, 2009.  She contended her due process rights were violated because a hearing officer would not allow her to testify in English.  Instead, he ordered that she testify in Mandarin which would then be translated in English and have that which was spoken in English translated into Mandarin.

months, Mrs. Zhou either refused to approve any of them or conditioned an approval which effectively was a disapproval. In the hopes that agreements could be reached, Ms. Leshinsky met with Mrs. Zhou 10 times but without success.

83. At a meeting on May 16, 2008, Mrs. Zhou wanted, at the district's expense, to have an audiologist make monthly observations of M.Z. Ms. Leshinsky pointed out that it was an inappropriate request but she offered to make such observations herself and report them to Mrs. Zhou. Mrs. Zhou rejected this suggestion and responded that because Ms. Leshinsky was on salary such an arrangement would not cost the district any money and an audiologist would.

84. On August 7, 2008, Ms. Leshinsky met with Mrs. Zhou who had requested M.Z.'s educational records. They were together for three hours and as she was leaving Mrs. Zhou said, "Cindy, if the District would pay for a private school like Moravian, this would all go away."[7]

85. At another meeting, Mrs. Zhou accepted a bagel that Ms. Leshinsky offered her, but asked if it was a bribe. When told no, Mrs. Zhou said, "Well, it's not going to work; I'm not going to agree to anything."

And she didn't.

86. Meetings were piled on meetings, conferences on conferences, demands on

_____

[7] In 2008, Mrs. Zhou also asked Mr. Agretto if the district would pay the costs required, $23,000 each per year, so that M.Z. and J.Z. could attend Moravian Academy. However, Mrs. Zhou did not say to Mr. Agretto, as she had to Ms. Leshinsky, that she would drive the district's costs up until the district would agree to do so. N.T.,

demands, all of which took teacher and staff time and left district personnel frustrated

87.  In December of 2008, Mrs. Zhou asked for a due process hearing, asserting that the district had inappropriately designed and implemented M.Z.'s IEPs and GIEPs for all or parts of the 2007, 2007-2008, and 2008-2009 school years.  The hearing officer limited the hearing to the implementation of the IEPs and GIEPs, ruling that in prior proceedings they had been found to be appropriate.

88.  Mrs. Zhou had listed 23 witnesses she intended to call.  The hearing officer found that only 12 of them were involved in the implementation of M.Z.'s IEP and GIEP.  To insure judicial efficiency, the hearing officer determined the order and the limits of their testimony.  When he explained this decision to Mrs. Zhou, she refused to participate in the hearing.[8]  *Trial Exh.* P-10, Z-219.  The hearing officer dismissed Zhou's claim with prejudice.  His decision was affirmed by the Commonwealth Court.  *Trial Exh.* P-10.

89.  Mrs. Zhou's request for a due process hearing to consider whether M.Z.'s IEPs and GIEPs had been appropriately designed was for an improper purpose.  In view of the fact that she appealed to the Commonwealth Court the hearing officer's dismissal of her claim, Mrs. Zhou's refusal to proceed was also improper.

90.  By 2009, the district's expenses incurred in an effort to meet Mrs. Zhou's demands and for the pre-hearings, mediations, and due process hearings she had requested,

---

[8] She stated as her reason for refusing to proceed: "This hearing– there's a lot of issues and questions for this hearing.  I cannot – I cannot take them – ask or discuss those issues and questions.  And I have said that the whole– and with all the questions I have told you, I just cannot continue this hearing;  therefore I can only choose  – I can only choose not to continue.  Then I can finish.  That's the end of it."

were approaching $200,000.

91.  Either because he was directly involved or from his staff's reports, Richard Agretto, in his capacity as the district's director of special education, knew of the history of the district's interactions with Mrs. Zhou.

92.  Realizing that he was responsible to provide appropriate programs for all of the district's students and that funds to do so were limited, Mr. Agretto wanted to stop Mrs. Zhou from continuing the drain on the district's resources with demands he felt were unreasonable.  He was aware that in the 2008-2009 school year alone, there had been four due process hearings, two mediation sessions, and two civil rights investigations.  He knew that Mrs. Zhou had filed a request to develop a new IEP right after the hearing officer had affirmed the IEP dated May 31, 2007, before it had even been implemented.

93.  Mr. Agretto was also aware that the constant litigation had an impact on M.Z. and J.Z. because the appropriate services the district wanted to provide could not be implemented while the IEPs were still being disputed by Mrs. Zhou.

94.  As a result of all these considerations and the fact that all along the way the various hearing officers had affirmed as appropriate everything the district was doing,  Mr. Agretto consulted with counsel and it was decided to bring this lawsuit.

95.  Although called at trial to testify on behalf of Mrs. Zhou, the testimony of Lee Ann Grisolano, Ph.D, provides further support for my findings.  Dr. Grisolano's doctorate is in school and pediatric psychology and she is a certified school psychologist in

Pennsylvania. Self-employed in private practice, Dr. Grisolano evaluates children with learning disabilities so that they can be overcome. Over the course of her career she has done hundreds of evaluations and she was accepted as an expert in this proceeding.

96. In September 2010, Dr. Grisolano met with M.Z. for approximately five hours. She reviewed his educational records, gave him a series of tests, and reached conclusions about his disabilities. Most importantly, Dr. Grisolano agreed that the district had provided various modifications, accommodations, and services that exceeded the requirements of his IEPs, and did not identify anything that the district should have done for him that it had failed to do.

97. An informed, interested, and observant parent can be of inestimable value to the education professionals who make up the rest of an IEP team. Not so the parent who insists on making unreasonable demands that impact the limited resources available to other needy children in the district.

98. Where there was a conflict between the testimony of the district's representatives and Mrs. Zhou, I accept their testimony as being more accurate.

99. I accept the testimony of Mr. Agretto and Ms. Leshinsky that Mrs. Zhou's intent was to drive up the district's costs and I make that a finding of fact. I further find that the district brought this lawsuit in an attempt to end the extraordinary expenses that were being incurred by the district as a result of Mrs. Zhou's continuing conduct.

After careful consideration of these findings of fact, I reach the following:

## CONCLUSIONS OF LAW

1.  The IDEA requires each school district to provide a free, appropriate, public education to each child with disabilities.

2.  The education and services provided for a child with disabilities shall be under public supervision and are to be without cost to the child and his or her parents.

3.  For each child with disabilities, an IEP must be prepared so that there will be benefits that can be measured.

4.  The IDEA contemplates a team approach to developing an IEP and parents play a vital role in this process; however, parental requests for services, no matter how well intentioned must be reasonable, made in good faith, and fall within a district's statutory obligations.

5.  The IDEA provides that I "may award reasonable attorney's fees as part of the costs" to the district if the "parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation." 20 U.S.C. § 1415(i)(3)(B)(i)(III).

6.  Mrs. Zhou's refusal to approve the IEP dated March 31, 2007, and her April 27, 2007 request for a due process hearing that she did not withdraw, was improper.

7.  The Bethlehem Area School District was the prevailing party at the due process

hearing that Mrs. Zhou had requested on April 27, 2007, and is therefore entitled to its costs of that proceeding and may also be entitled to its attorneys' fees as part of those costs.

8.  Although the district is entitled to recover its costs under the provisions of Fed. R Civ. P. 54(d)(1), the decision that the district is entitled to its costs, and may be entitled to reasonable attorneys' fees, is made under the applicable provision of the IDEA. 20 U.S.C. § 1415(i)(3)(B)(i)(III).  To determine whether attorney's fees should be awarded and in what amount, there needs to be additional proceedings at which counsel may present witnesses and legal arguments.

An appropriate order follows.